**SUTTER PRODUCTS COMPANY,**
Plaintiff-Appellant,

v.

**PETTIBONE MULLIKEN CORPORATION,** Defendant-Appellee.

**No. 17806.**

United States Court of Appeals,
Seventh Circuit.

June 5, 1970.

---

Lloyd M. Forster, Farley, Forster &
Farley, Detroit, Mich., Arlie O. Boswell,
Jr., Hibben, Noyes & Bicknell, Chicago,
Ill., for plaintiff-appellant.

Norman H. Gerlach, Chicago, Ill., Louis Robertson, Darbo, Robertson & Vandenburgh, Arlington Heights, Ill., for defendant-appellee.

Before CUMMINGS and KERNER, Circuit Judges, and GRANT, District Judge.[1]

CUMMINGS, Circuit Judge.

Plaintiff Sutter Products Company manufactures foundry equipment in Holly, Michigan. It charges that the Flexiblomatic machines manufactured by Pettibone Mulliken Corporation's Beardsley & Piper Division in Chicago, Illinois, infringe the apparatus claim of Sutter Patent No. 2,856,653. Plaintiff also asserts infringement of apparatus claim 3 of Sutter Patent No. 2,867,017 by another of defendant's machines which removes finished articles from the Flexiblomatics.[2] In addition to the apparatus claims, Sutter charges that the operations of defendant's machines infringe method claim 7 of Sutter '653 and method claim 2 of Sutter '017.

The district court concluded that in light of the prior art in the field, the Sutter patents were at best entitled to a narrow range of equivalents. The court first held that no infringement had occurred. It then alternatively held that the Sutter patents must be invalidated as obvious or anticipated by prior art.

Before passing upon the substantive issues of validity and infringement, it is necessary to deal with preliminary challenges to the district court's reliance upon certain items as "prior art."

*Disqualification of Prior Art References Not Required.*

1. *The Shell Blomatic Machine*

■ Plaintiff objects to the references made in testimony to the defendant's "Shell Blomatic" machine which was demonstrated at a foundry convention in Cleveland in May 1954. Plaintiff first contends that defendant is precluded from relying upon this machine because of the failure to include it in the list of "prior art references" supplied to plaintiff pursuant to 35 U.S.C. § 282.[3]

The language of Section 282 is directed toward the disclosure of specific patents, publications and persons. It does not purport to order notice of specific incidents of prior use, demonstrations of individual apparati, or prototype or specimen machines. The statute lays down no arbitrary or absolute rule to prevent surprise at trial. In the last sentence of Section 282, Congress expressly permits the trial judge to admit an exhibit into evidence which, though failing to satisfy the strict requirements of the statute, nevertheless does not deprive the plaintiff of an adequate opportunity to present his case. Stiffel Company v. Sears, Roebuck and Co., 313 F.2d 115, 116–117 (7th Cir. 1963), reversed on other grounds, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661; C. S. Johnson Co. v. Stromberg, 242 F.2d 793, 797 (9th Cir. 1957),

1. Chief Judge Robert A. Grant is sitting by designation from the United States District Court for the Northern District of Indiana.

2. Defendant's Flexiblomatic machine is described in Hunter, et al. Patent No. 3,096,547. The lift-off machine which is the other subject of this suit is the subject of defendant's Hunter Patent No. 3,107,402.

3. 35 U.S.C. § 282 provides in pertinent part:
 "In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before trial, of the country, number, date, and name of the patentee of any patent, the title, date and page numbers of any publication to be relied upon as anticipation of the patent in suit or * * * as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires."

certiorari denied, 355 U.S. 816, 78 S.Ct. 19, 2 L.Ed.2d 33; Thermo King Corp. v. White's Trucking Service, Inc., 292 F. 2d 668 (5th Cir. 1961). Even if Section 282 is read to require disclosure of individual instances of use, such as the demonstration of the experimental Shell Blomatic at the convention, the district court did not abuse its discretion in considering that machine. There is no indication that defendant deliberately obscured its intention to rely upon the Shell Blomatic machine. The plaintiff does not appear to have been surprised. Depositions of both Raymond Sutter and Otto W. Winter dealt extensively with the machine. Those depositions were allowed into evidence without objection. The list of "references" actually furnished plaintiff included the issue of "Better Methods" magazine devoted to the description of defendant's machines demonstrated at the convention, including the Shell Blomatic. After an extended argument by both parties, the trial judge admitted the testimony of expert witness Roy F. Nosek on the Blomatic and excluded various photographic exhibits from consideration. There is no indication that this decision prevented plaintiff from preparing or presenting an adequate response to the testimony as it applied to the Shell Blomatic machine. We conclude that the action of the court below was not an abuse of discretion contrary to Section 282.

■ A second basis for plaintiff's objection to the evidence of the Blomatic involves the alleged failure of defendant to produce available drawings of that machine as agreed by counsel. At the deposition of Otto Winter, inventor of the Blomatic, plaintiff requested the production of certain "complete drawings" of the machine referred to by the deponent. The parties completed their examination of Winter with the exception of questions pertaining to the drawings. The deposition was continued until defendant ascertained the existence and availability of any such drawings. Plaintiff contends that the defendant's failure to produce the drawings misled plaintiff

into believing that the Blomatic machine had been abandoned as a reference to prior art. Plaintiff further contends that the lack of access to the drawings prejudiced its preparations by hampering any investigation of the Blomatic machine through analysis and further examination of Mr. Winter.

There is scant evidence to support plaintiff's contention of surprise at defendant's reliance upon the Blomatic at trial. The defendant's failure to produce drawings of the original Shell Blomatic did not reasonably indicate that the machine would not be relied upon as prior art at the trial. Production was conditioned upon availability, and the drawings were to be produced for further examination of the deponent Winter. Certainly there was no basis for construing the absence of any subsequent response as an abandonment of reliance upon that device. Nor can we agree that defendant's actions disclose the deliberately prejudicial suppression of relevant drawings which might have compelled the trial judge to exclude all evidence of the Shell Blomatic.

The record does not clearly indicate that defendant deliberately failed to investigate or produce the requested drawings. Counsel for defendant represented below that he had made a diligent investigation which revealed that the Blomatic machine displayed at the convention had been dismantled, and that no drawings of that machine existed. Defendant's brief here reiterates that there were no such drawings. The Blomatic was apparently built from component parts of existing Beardsley & Piper machines of which drawings had been made. Nothing in the record indicates that separate drawings of the general arrangement of the Blomatic machine had been made or were in existence at the time of this litigation. Nor does the record clearly establish that any detailed parts drawings existed for the Blomatic, as distinguished from the Beardsley & Piper machines from which the components were taken.

No true prejudice may be claimed by plaintiff from its inability to scrutinize any existing detailed drawings of Blomatic's component parts. No drawings were allowed into evidence without plaintiff's prior opportunity to inspect them. A thorough cross-examination was made at Winter's deposition concerning the nature, operation and construction of the Blomatic. No objection was made to the introduction of that deposition into evidence. It is not clear that the original request for "complete drawings" of that machine contemplated the production of drawings of the complete Blomatic or its various parts, and no subsequent attempt was ever made to procure their production.

Plaintiff's actions in connection with these drawings seem geared to preclude the consideration of pertinent evidence of prior art rather than to prevent surprise or insure adequate preparation. At no time was the court below asked to order the production of any drawings or to continue the trial until adequate preparation could be made to rebut defendant's evidence. Moreover, during the entire year which elapsed between the termination of Winter's deposition and the beginning of trial, no inquiry was ever made by plaintiff concerning the existence of these drawings. Plaintiff took no steps to provide the trial court with information necessary to establish their very existence and relevance or to show any potential prejudice to its case. Plaintiff could have minimized any prejudicial impact by any of these procedures. In light of these facts, we cannot conclude that the trial judge abused his discretion by admitting testimony as to the Shell Blomatic demonstrated at the foundry convention in 1954.

Plaintiff also challenges the use of the Shell Blomatic because of allegedly insufficient and conflicting evidence. Plaintiff points to certain slight discrepancies between the descriptions of the Blomatic given by deponent Winter and trial witness Nosek. The divergence in description was neither great nor incapable of resolution by the district judge. We do not find any basis to set aside his findings on the ground that they were "clearly erroneous" under Rule 52(a) of the Federal Rules of Civil Procedure.

Finally, plaintiff seeks to disqualify the Blomatic as an unsuccessful, abandoned experiment. Plaintiff disputes the finding of the district court that

"One of the machines exhibited at the May, 1954, convention was defendant's 'BLOMATIC' shell molding machine, also called the 'SHELL BLOMATIC.' Useable and satisfactory shell sand articles were made on this machine at the convention. Some were handed out as souvenirs. Defendant did not sell the exhibited shell blowing machine (a three-station machine shuttling two pattern boxes alternately between a common blowing station and separate curing and stripping stations), but sold machines embodying its principle. Defendant's 'BLOMATIC' machine fully established that the development of resin-coated sand had cleared the way for commercial use of the old blowing technique for resin-coated foundry sand wherever it might be desired, including the blowing of hollow shell cores."

Plaintiff contends that the evidence established that the machine demonstrated at the convention was unsuccessful in its operation, and that the experimental model was abandoned by dismantling after the show and was never successfully employed to make actual sand cores.

The evidence does not clearly establish that the Blomatic failed to operate successfully at the foundry convention. Although there was evidence from plaintiff's expert witness Youngdahl that the Blomatic failed to produce suitable sand mold articles and its operation was "unsuccessful," there was ample evidence to the contrary. Defendant's expert Robert Lund was well acquainted with the creation of the machine and its operation at the convention. Although he readily conceded imperfections and commercial problems, Lund testified that the

Blomatic "was actually making molds" at the convention. He indicated that in his opinion the occasional faulty performance of the Blomatic was attributable to the operation or construction of the prototype itself and not the principal design of the machine:

> "Adjusted right and properly, it did operate, we did make cores or molds.

> \* \* \* \* \* \*

> "They [sand articles produced by the Blomatic] could be used for molding."

Nor is any inference of unsuccessful design or abandonment compelled from subsequent occurrences. The evidence indicates that the original Blomatic was dismantled but the design was never discarded. Although commercial concentration was placed upon defendant's earlier Formatic machine, continued development and perfection of the Blomatic's basic features apparently took place. "Comparable" machines were subsequently sold which extended the principles of the Blomatic and adapted them to successful foundry operations. The fundamental features of the Blomatic were preserved, and the particular alterations were detailed and described by defendant's expert, Roy F. Nosek, as representing the evolution or natural outgrowth of the Blomatic. The district court was therefore within bounds in concluding that the Shell Blomatic was neither unsuccessful nor abandoned. See 1 Deller's Walker on Patents, § 69, p. 327 (2d ed. 1964). He properly found that the demonstration of that machine at the 1954 foundry convention marked a successful advance in the technology of shell molding by combining blowing techniques with the use of resinated sand.[4]

2. *Harrison Patent No. 2,864,134*

Plaintiff also objects to the trial court's consideration, as "prior art," of the machine covered by Charles R. Harrison's Patent No. 2,864,134. Harrison '134 was filed on January 27, 1955, approximately five months before the filing date of '653, the first of the Sutter patents. In order to avoid the application of 35 U.S.C. § 102(e),[5] plaintiff sought to establish an earlier date for the invention of Sutter '653. The evidence from plaintiff's deposition tended to support a claim that the machine was conceived by July 1, 1954, when proposal drawings of plaintiff's invention were prepared. The evidence further indicated that plaintiff's invention was reduced to practice by December 28, 1954, when the first machine was delivered to a customer. In turn, defendant presented evidence which tended to support an even earlier date of invention for Harrison '134. Plaintiff first attacks the adequacy of the determination of the trial judge that the Harrison machine is entitled to a date of invention "at least as early as June 9, 1954." We conclude that there was ample evidence to support that specific date, and, in any event, the judge was correct in treating Harrison '134 as predating Sutter '653.

The depositions of Harrison and Charles L. Lovercheck, his attorney during the time in question, support the conclusion that the Harrison machine was completed well before Sutter '653. By June 9, 1954, it seems clear that the Harrison machine had been conceived and reduced to a working model which successfully produced sand articles. Harrison began his work in the latter part of 1953, after completion of his earlier sand-blowing machine (which was patented as No. 2,820,998). Lovercheck's deposi-

---

4. This need not necessarily indicate that the distinctions between the Blomatic and later modified sand-blowing shell-molding machines produced by Beardsley & Piper have no bearing upon the identity of the "invention" for purposes of establishing or refuting anticipation of the Sutter patents by prior art under 35 U.S.C. § 103, discussed *infra*, note 11.

5. Section 102(e) provides:
 "A person shall be entitled to a patent unless— \* \* \*
 "(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent \* \* \*."

tion indicates that he observed a working model of Harrison '134 when he visited Harrison's establishment in the early part of 1954. He drew up a patent application and drawings which he forwarded to Harrison for approval on June 9, 1954. Harrison is entitled to a date no later than June 9, 1954, for his invention because the invention was conceived and reduced to practice by then. See Deller's Walker on Patents, §§ 45–46, pp. 191–210 (2d ed. 1964). Accordingly, regardless of the evidence supporting a date of invention for Sutter '653 earlier than Harrison's filing date, Harrison '134 may be considered as a prior invention under 35 U.S.C. § 102(g).[6]

■■ Plaintiff next argues that even if the Harrison invention may be relied upon to establish anticipation under Section 102(g), the machine may not be considered "prior art" to show obviousness under Section 103.[7] Plaintiff contends that under Section 103, "prior art" must be confined to matters of public knowledge. Since plaintiff invented his '653 machine before the filing date of the Harrison machine's patent application, plaintiff could have had no knowledge of Harrison's work and, plaintiff claims, Harrison '134 should therefore be disqualified. We find the argument without merit.

The constitutional purpose which is evident in Section 103 limits the grant of patent monopolies to nonobvious "inventions":

"Innovation, advancement, and the things which add to the sum of useful knowledge are inherent requisites in a patent system which by constitutional command must 'promote the Progress of * * * useful Arts.'" Graham v. John Deere Co., 383 U.S. 1, at p. 6, 86 S.Ct. 684, at p. 688, 15 L.Ed.2d 545.

Congress has defined an objective standard in Section 103 by which the inventiveness of a device or process is to be tested. Under that Section, this objective test applies equally to "prior art" as to the "person having ordinary skill in the art." Cf. Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536, 538 (2d Cir. 1966). Thus in Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304, the Court rejected the claim that "prior art" included only publicly available information and not a previously filed patent application:

"To adopt the result contended for by petitioners would create an area where patents are awarded for unpatentable advances in the art. We see no reason to read into § 103 a restrict-

---

6. Section 102(g) provides:
 "A person shall be entitled to a patent unless—* * *
 "(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."
 Plaintiff has belatedly sought to avoid the coverage of Section 102(g) by claiming that Harrison had abandoned, suppressed, or concealed his invention. The only evidence to which plaintiff points is the delay of approximately eight months between the June 9, 1954, date of invention of the Harrison machine and the filing date of his patent application. Con-

cealment prior to filing is not unreasonable *per se* (Dewey v. Lawton, 347 F.2d 629, 52 CCPA 1573 (1965)), and there is nothing to show that the delay here was overlong. We note in this respect that Sutter's own delay lasted between six months and a year or more, depending upon the date of invention to be ascribed to Sutter '653.

7. 35 U.S.C. § 103 provides:
 "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

ed definition of 'prior art' which would lower standards of patentability to such an extent that there might exist two patents where the Congress has plainly directed that there should be only one." 382 U.S. at p. 256, 86 S. Ct. at p. 338.

Although *Hazeltine Research* dealt with the specific correspondence between Section 103 and Section 102(e), the considerations expressed are equally applicable to prior inventions under Section 102(g). Application of Yale, 347 F.2d 995, 1000, 52 CCPA 1668 (1965); Application of Risse, 378 F.2d 948, 956, 54 CCPA 1495 (1967). The correspondence between the relevant "prior art" under Section 103 therefore includes all material which would be considered to determine novelty under Section 102. See Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227, 1233 (7th Cir. 1969), certiorari denied, 397 U.S. 1037, 90 S.Ct. 1354, 25 L.Ed.2d 648.

Plaintiff finally objects to the sufficiency of the disclosure of Harrison '134 and claims that the machine, as described in the patent, was inoperative. The proper general considerations are stated in Deller's Walker on Patents, § 75, p. 362 (2d ed. 1964):

> "An invention which has turned failure into success and which has been utilized successfully and has functioned satisfactorily possesses completeness, sufficiency and operativeness. To anticipate a later invention, a complete, sufficient and operative disclosure must be available which will enable those skilled in the art to carry the invention into practice operatively, functionally and successfully with the production of satisfactory results."

 In support of its contention that there has not been an adequate disclosure of the machine, plaintiff calls attention to alleged defects in the patent description. Plaintiff first points to discrepancies between the written and diagrammatic descriptions of the stripping operations of Harrison '134. These discrepancies involve the existence and location of holes through which stripping pins were intended to move in the process of separating the sand mold from the chamber in which it is formed. In addition, plaintiff refers to defects in drafting and the divergence between the Harrison diagrams and ordinary drafting practice. In neither case has plaintiff called attention to any technical shortcoming in the total description which seriously impairs the degree of disclosure. The object, means, and method of the patent are not obscured. The evidence indicates that one reasonably skilled in the art could nevertheless follow the patent description and, with little difficulty, construct a duplicate of Harrison '134.

Finally, plaintiff contends that several features of the Harrison patent description render the machine inoperative as described and therefore disqualify it as "prior art." Plaintiff first points to the presence of holes in the pattern box which would allegedly permit such serious leakage that the machine would be incapable of producing sand molds. In addition, it claims that the patent fails to disclose any method for stripping the finished sand mold from the upper portion of the pattern box. That process, it is asserted, is necessary for production of sand articles since they cannot otherwise be removed from the pattern box.

 It is well settled that a description which is technically inoperative is not disqualified as prior art if rendered operative by the exercise of ordinary skill. American Laundry Mach. Co. v. Strike, 103 F.2d 453, 457 (10th Cir. 1939); In re Dowty, 118 F.2d 363, 366, 28 CCPA 1016 (1941); Dalin v. Watson, 92 U.S.App.D.C. 270, 204 F.2d 730, 732 (1953). Moreover, the inoperativeness of a machine as a whole need not render worthless as prior art each portion of the machine. Gilbert v. Marzall, 87 U.S.App.D.C. 1, 182 F.2d 389, 394 (1950); Application of Shepherd, 172 F.2d 560, 563–654, 36 CCPA 810 (1949). Inefficiency, even to the point of practical ineffectiveness, does not necessarily invalidate an invention

as prior art in all its aspects. Dalin v. Watson, *supra*, 204 F.2d at p. 732. So long as it embodies the same construction and principle as the alleged invention, a structure is effective as prior art even though the construction of the machine is crude, or the machine is imperfect in operation. Zephyr American Corporation v. Bates Mfg. Co., 128 F.2d 380, 385 (3d Cir. 1942). Moreover, as the court observed in Application of Reynaud, 331 F.2d 625, 628, 51 CCPA 1310 (1964),

"In the absence of a clear showing that the * * * structure will not operate as disclosed, we must presume that it does so operate and will therefore treat it as a valid reference for all that it discloses."

In this case the alleged defects in the operativeness of the patent are insufficient indications upon which to base a disqualification of Harrison '134. There was testimony that the Harrison machine was seen in actual operation. None of the difficulties posed by the presence of holes in the pattern box appears to have been significant. Certainly there is nothing in the record to indicate that one skilled in the art could not have avoided any problems posed by sand leakage through stripping or blowing holes. Defendant's expert, Roy F. Nosek, expressed the opinion that at least in most instances, satisfactory stripping from the upper section of the pattern box could be achieved by the combination of gravitational and adhesive forces alone. Moreover, the general principles outlined for stripping the bottom section of the pattern box could easily be adapted to strip the sand article from the upper section. Finally, even if the machine were inoperative in these few details, they would not invalidate the significant similarities between the Harrison and Sutter machines upon which the court below relied. The variances and defects upon which Sutter relies in attempting to disqualify Harrison '134 are more appropriately considered in determining the extent of any novel and nonobvious developments in the art represented by Sutter.

We turn now to consider the validity of the Sutter patents upon which this suit is based.

### The Sutter Patents Are Invalid for Obviousness.

As its alternative disposition of this case, the trial court held that the Sutter patents, if capable of a construction which could be infringed by defendant's apparatus and method, were invalid as anticipated or obvious in view of the prior art. On appeal, plaintiff has concentrated upon attacking the elements of prior art employed by the district court. Our review of the developments of this art persuades us that the Sutter patents lacked the attributes required of patentable inventions by 35 U.S.C. § 103 (note 7 *supra*).

In order to appreciate the context in which the various pertinent inventions arose, a discussion of the industrial function and history of this art is helpful. The instant methods and apparati are employed in the production of sand cores for metal casting in the foundry industry. Foundries make cast metal products by pouring molten metal into sand molds. The molten metal flows between the mold and a sand core suspended within the mold. Having formed the cast product, the sand core must disintegrate and be removed from the casting. In order to perform its function, the sand core must possess certain properties. It must provide a smooth surface which will retain its shape and withstand the flow of molten metal during pouring. The sand must thereafter retain its shape until the metal has set and begun to solidify. In order to withstand initial pouring and retain the desired shape in the face of pressure and heat, the sand is combined with a "pressure binder" which must, after the desired time, dissipate, allowing the removal of the sand from the finished product.

The sand core is formed in a split metal pattern box, the upper section of which is called the "cope," while the lower section is known as the "drag." Prior to 1940, sand molds and cores were

formed by compacting wet or oil sand in cold pattern boxes. After formation in the mold box, the sand articles were removed and cured or baked. In the early 1940's, "shell molding" originated in Germany. Under this technique, a heat curable resin replaced water or oil as the binder, and the pattern box itself was heated. The number of steps in the process was thereby reduced, and the sand molds and cores gained strength and a smoother finish from the use of resin.

Prior to 1954, two different processes of shell molding were known. The commercially more successful approach, practiced by the instant parties, employed "investment" or "roll-over" shell-molding machines. In this process, the sand and binder mix was poured onto a heated pattern. After investment with sufficient heat to provide an initial cure of the article to the desired thickness, the pattern was rolled over, and the loose sand was dumped back into the supply chamber. After thus removing excess sand, the shell mold was completely cured, and the sand article removed. The alternative technique was to fill the pattern boxes by blowing sand into them. This technique was well developed, and defendant's "Champion" core blower was among the commercial models. Blowing had the advantage of permitting the formation of virtually an entire core at one time and in one piece, because the sand could be injected into a closed pattern box through a small hole. As early as 1950, an article in "The Foundry" magazine asserted that shell cores were best made through this technique. Nevertheless, until 1952, this process was considered inferior because of the lack of any suitable sand mix for blowing.

In about 1952, resin-coated sand was developed. This sand replaced the previously used "dry mix" of discrete sand and resin particles which had proven unacceptable for blowing. The utility of this resinated sand for blowing was demonstrated at the foundry convention in Cleveland in May 1954. At that convention, as already noted, defendant exhibited an apparatus called the "Shell Blo-

matic." This machine blew resin-coated sand to form sand figurines, some of which were distributed as souvenirs. These figures apparently possessed the strength and smoothness of surface required of sand cores and molds for foundry use. The Blomatic machine itself combined features and parts of pre-existing elements of the art. Defendant's "Better Methods" magazine for June–July 1954 described the principal features of that prototype:

"The shell Blomatic unit displayed at the show consisted of a single shell blowing machine, which closely resembled a standard Champion Core Blower, and two combination stripping and curing stations located on either side of the blower. Two patterns were used, and both were blown beneath the shell blower magazine. A short time was allowed for investment before the pattern and blown shell were drawn away from the sand magazine. The blown shell on one pattern was shifted to the right hand curing and stripping station and the blown shell on the other was shifted to the left hand curing and stripping station. This use of two separate curing and stripping stations permits a full utilization of the shell blower's capacity. The shell blower may also be combined in a complete rotary 'Formatic-type' unit by replacing the investment station."

Beardsley & Piper continued to develop and refine these principles and subsequently sold several comparable machines for use in the foundry industry.

Even before the demonstration of the Beardsley & Piper Blomatic in 1954, Charles Harrison had successfully adapted the resin-coated sand to shell blowing. His first patented sand blower was completed in mid-1953, and the patent application was filed on October 12, 1953. During the following year, Harrison completed work on his improved blowing machine which, as seen, later received Patent No. 2,864,134. Like the Blomatic, Harrison's machines reveal many features adapted from previously known techniques. Harrison's machines also

shuttled patterns horizontally between the blowing station and the station at which the curing and removal or stripping took place. As with the Blomatic, Harrison's machines alternated between the cope and drag pattern sections and had separate curing and stripping stations for the two patterns. Harrison employed both upward and downward blowing from the sand chamber into the cavity of the pattern. He also used initial curing by heat at the blowing station by blowing into heated molds.

Shortly after the Blomatic and the Harrison machines were developed, plaintiff produced and filed the patent application for its '653 sand core blowing and stripping machine. The application, filed July 23, 1955, and approved October 21, 1958, joined reference to blowing and stripping elements in its claims.[8] Similarly, the patent claims of Sutter '017 filed February 13, 1957, and approved January 6, 1959, cover these two distinct steps in the formation of the sand articles.[9]

8. Claims 7 and 9 of Sutter's Patent No. 2,856,653 provide:

"7. In a method of making a sand article, the steps of positioning a moldbox having separable cope and drag portions defining an interior mold cavity in vertical registry with a sand chamber containing a body of heat-curable sand mix, the cavity communicating with the sand mix body, blowing sand mix from said chamber into said cavity, initially curing the sand mix in the cavity, transferring the moldbox to a curing and stripping position, heating the moldbox to further cure the sand mix in the cavity to form a finished sand article, elevating the cope portion of the moldbox from the drag portion thereof, retaining the sand article on the drag portion, and elevating the finished sand article from the drag portion to a position intermediate the cope and the drag."

"9. A machine for making foundry sand articles characterized by separable metal box sections defining an article cavity, means for transferring the co-operating box sections from one station to another station, means at the one station for filling said article cavity with a sand mix having a thermosetting binder, heating means for curing said binder within said cavity, means at said another station for ejecting said article from said cavity, said last means including a single actuating cylinder and means actuated thereby for sequentially opening and stripping said article from said cavity, each of said metal box sections being provided with a stripper pin plate relatively movable thereto, and means actuated by said single cylinder providing three stages of relative movement between said box sections and stripper plates including a first stage where one of said box sections alone moves relative to said other three elements thereby stripping the article from

428 F.2d—41½

said box section, a second stage wherein said box section and its associated stripper plate move conjointly together, and a third stage wherein said other stripper plate moves relative to said other box section stripping the article therefrom."

9. Claims 2 and 3 of Sutter Patent No. 2,867,017 state:

"2. In a process for making heat-cured sand cores or molds in a pattern box having separable cope and drag sections, the steps of advancing a box in a planar path to a blowing station, shifting the box from said path, blowing into the box a fluid stream having a heat-curable sand composition suspended therein, returning the box to said path, transferring the pattern box to a curing station, shifting the box from said path to interpose the box between a pair of spaced heating elements at said curing station, curing the sand cores or molds, elevating the cope from the drag to expose the sand cores or molds while forcibly retaining the molds or cores on the drag, elevating the separate sand cores or molds from the drag, sequentially lifting and laterally removing the cured sand cores or molds from their positions intermediate the cope and the drag, and returning said box to said path for subsequent return to said blowing station.

"3. In an apparatus for forming sand cores or molds, a blowing station, a stripping station, means for transferring a pattern box from the blowing station to the stripping station, means at said stripping station for elevating a sand core or mold from the pattern box, supporting means insertable beneath the sand cores or molds, means for elevating said supporting means with the core or mold thereon, and means for moving said supporting means laterally to convey the core or mold therewith."

In light of the developments in the art of sand core blowing, including the Blomatic and the Harrison patents, we conclude that the Sutter machines do not describe patentable inventions. Considered separately, the individual features of Sutter '653 and '017 reveal no nonobvious advance over previously well established methods and apparati. The technique of blowing resin-coated sand was already discovered and successfully applied by both the Blomatic and the Harrison machines. Vertical blowing in both directions, and initial cure were each used independently of the various machines under scrutiny in this case, and the Sutter patents at best depict more efficient, practicable, and commercially successful developments in the art. Nothing in the blowing operation or mechanism of the Sutter machines amounts to the type of innovation, advancement in the art, or addition to the store of useful knowledge which distinguishes patents from a useful extension of ordinary skill. See Graham v. John Deere Co., 383 U.S. 1, 14 et seq., 86 S.Ct. 684, 15 L.Ed.2d 545.

By the same token, no patentable claim has been made nor offered with respect to the curing process or apparatus. Sutter '653 envisioned only the established curing process and apparatus with the adaptations necessary to fit it to the other elements of the core blower and useful to efficient production. Nor can the paired heating elements of Sutter '017 be contemplated as an achievement deserving a patent. Plaintiff has not attempted to claim that dual heating units were such a unique or subtle advance in the sand core industry that their presence entitles the mechanism to a monopoly as a nonobvious device.

A more serious claim has been pressed, however, as regards the stripping method and apparatus described in the two Sutter patents. Satisfactory stripping was necessarily well developed as an integral aspect in the art of producing sand molds. Like other molding fields, such as the plastics industry, stripping pins and plates had previously been employed in this industry. Despite the claimed inadequacies of description or operation, the Harrison '134 core blowing apparatus employed a single cylinder which coordinated the elevation and separation of the sections of the pattern box and stripped the finished article from the drag section by means of stripping pins. Plaintiff's three-stage stripping merely extends the same process to the cope section in addition to the drag and adds another movement to the process. In the closely analogous field of plastic molding, where the need for efficient mechanical stripping devices closely parallels the need present in the instant industry, three-stage stripping was already clearly provided by the Strauss 2,828,507 patent. Plaintiff's attempts to distinguish Strauss' method and apparatus from Sutter's devices has been unpersuasive. No meaningful distinction has been drawn by plaintiff between the single cylinder it employed and the use of multiple cylinders in the Strauss and Hunter machines. The evidence is at least as persuasive that the use of multiple cylinders in the latter mechanisms represents an advance over the single cylinder employed by Harrison and Sutter.[10] In addition, the district court noted that the principle of the Strauss patent could be combined with the use of the single cylinder in Harrison's '134 machine to provide substantially the same method and apparatus for stripping as that described for Sutter's machines.

On appeal, plaintiff has challenged the accuracy of the trial judge's finding that the Strauss and Harrison '134 devices could easily be combined to achieve satis-

---

10. Plaintiff's difficulty in distinguishing between the number of cylinders used in stripping is compounded by its need to establish infringement. Plaintiff has not satisfactorily resolved the seeming inconsistency of the two positions it must take with regard to this aspect. Even grant-

ing the difference between patentability and infringement proof, the evidence seems to support the conclusion of non-infringement of an unpatentable device more nearly than it does infringement of a valid patent.

factory cope stripping. The testimony of defendant's witness Robert Lund, however, strongly supports the judge's determination. Lund indicated that the placement of stripping pins at any point would be a simple matter, and he produced a sketch of a simplified combination of the Harrison '134 stripping mechanism with a cope stripping attachment. This sketch closely resembles the stripping apparatus of the Strauss patent, and plaintiff has not shown it to be deficient in principle or application. In light of the evidence adduced at the trial, we must conclude that plaintiff's use of cope and drag stripping in three stages actuated by a single cylinder did not constitute a major advance in the relevant art, either in principle or practical application.

There remains the individual feature of plaintiff's automatic removal of the finished article from the separated pattern box. This claim, specifically included only for the Sutter '017 machine, fails to show an appreciable extension of prior art. Plaintiff's witness, Paul F. Youngdahl, admitted that the mechanical lift-off merely performed the same function as had previously been accomplished manually. Automatic lift-off was contemplated for use with respect to plaintiff's first patented core-blowing machine. Plaintiff's 1955 descriptive sales bulletin for its '653 machine states that, "after curing is completed core or mold is stripped from 'box' and manually or automatically unloaded." In John E. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 328, 44 S.Ct. 346, 349, 68 L.Ed. 708, the Court pointed out that

"[t]he change from hand to the use of machinery often involves invention. * * * But the record does not show that there has been substantial change in the mechanics or method of making. The steps are the same, and the succession from one to the other are as in the manual art, and the transfer from hand to power was by the usual appliances, and had all been indicated before the [instant] patent."

Under this principle, the introduction of automatic removal of the finished cores, even if newly introduced into this field, could not be claimed as unobvious *per se*. Cf. Modern Art Printing Company v. Skeels, 223 F.2d 719, 721 (3d Cir. 1955).

Finally, we consider the patentability of the combination of these separate elements into a single machine. Each of these elements present in the Sutter machines was, as indicated, either known or an obvious extension of prior art. The combination of the various elements into a single, operating machine did not change the character or essential mode of function for any individual element. As the Supreme Court recently concluded in Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 61, 62–63, 90 S.Ct. 305, 308, 24 L.Ed.2d 258:

"A combination of elements may result in an effect greater than the sum of the several effects taken separately. No such synergistic result is argued here. It is, however, fervently argued that the combination filled a long felt want and has enjoyed commercial success. But those matters 'without invention will not make patentability.' Great A. & P. Tea Co. v. Supermarket [Equipment] Corp., 340 U.S. 147, 153, [71 S.Ct. 127, 95 L.Ed. 162]."

\* \* \* \* \* \*

"We conclude that while the combination of old elements performed a useful function, it added nothing to the nature and quality of the [prior art] already patented. We conclude further that to those skilled in the art the use of the old elements in combination was not an invention by the obvious-nonobvious standard. Use of the [blowing and stripping mechanisms shown by Sutter's machines] in this important field marked a successful venture. But as noted, more than that is needed for invention."

Plaintiff's patents accomplished a practically effective and efficient adaptation of core blowing and complete stripping of drag and cope patterns in this industry. However, the bases of all the elements represented in the Sutter patents were already present in the field

or in analogous arts. Plaintiff's machines may have furthered development and refined processes, but they did not reach the level of innovation and advancement which is required of patents. The "cleverness" of the individual features or their effectiveness, singly or in combination, did not satisfy the "strict observance" required of the standards set forth in Section 103. See Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 15 L.Ed.2d 545; Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed. 258.[11] Accordingly, these claims of Sutter Patents Nos. 2,856,653 and 2,-867,017 were obvious in light of the level of the prior art and are therefore invalid.

Because these claims of plaintiff's patents were invalid for obviousness, we do not reach the issues of infringement, over-claiming, aggregation and double inclusion. The additional objections raised by plaintiff have been considered but are without merit.

The decision of the district court is affirmed.

11. Since our decision is based on the rule of 35 U.S.C. § 103, there is no need to decide whether the Sutter "inventions" were anticipated by any of the elements of prior art cited by defendant. See note 4 *supra*. Nor need we decide, in light of the prior art relied upon in this case, whether the basic advances of core blowing by resinated sand, or cope stripping, themselves represented patentable advances over the prior art.