**CARDIAC PACEMAKERS, INC., Plaintiff,**

v.

**CORDIS CORPORATION, Defendant.**

Civ. No. 4–77–427.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 31, 1981.

Haugen & Nikolai, Orrin Haugen, Minneapolis, Minn., Allegretti, Newitt, Witcoff & McAndrews, Ltd., Charles G. Call and Bradley J. Hulbert, Chicago, Ill., and Kevin T. O'Malley, St. Paul, Minn., for plaintiff.

Kenway & Jenney, Henry D. Pahl, Jr., and Gilbert H. Hennessey, Boston, Mass., and Williamson, Bains, Moore & Hansen, Malcolm L. Moore, Minneapolis, Minn., for defendant.

MEMORANDUM & ORDER

DEVITT, Senior District Judge.

This is a patent case involving the patentability of an implantable electronic pacer to control irregular human heart beats. Three hundred thousand such devices manufactured by 27 different companies are sold world-wide each year. Two of the principal producers are arranged in adversary positions here.

The litigation between these parties commenced when Cordis Corporation (Cordis), a Florida corporation, brought a claim for patent infringement against Cardiac Pacemakers, Inc. (CPI), a Minnesota corporation, in the District of Massachusetts. CPI then commenced this declaratory judgment action against Cordis, and the Massachusetts action was dismissed for lack of venue.

In the first suit brought by Cordis, CPI was charged with willfully infringing United States Patents Nos. 3,557,796 to Keller, et al., and 3,805,769 to Terry et al.

CPI filed this action, seeking a declaration that the Terry and Keller Patents are invalid, unenforceable, and not infringed, by reason of prior invention and obviousness under 35 U.S.C. §§ 102 and 103. Cordis counterclaimed, seeking damages for and injunctive relief against infringement of these two patents, and United States Patent No. 4,095,603, which in the interim, had been issued to Davies. CPI replied, asserting the Davies Patent was invalid, unenforceable, and not infringed.

Upon reissue proceedings instituted by Cordis in the U.S. Patent and Trademark Office on the Keller Patent, the Patent Examiner found that the invention defined

by claims 1, 2, 6, 7, 9–11, 13 and 14 of the Keller Patent would have been obvious to a person of ordinary skill at the time the Keller invention was made. This decision was upheld by the Patent Office Board of Appeals and the Court of Customs and Patent Appeals. *In re Keller, et al.,* 642 F.2d 413 (Cust. & Pat.App.1981). Cordis then amended its counterclaim by withdrawing the Keller and Davies Patents. Only the Terry Patent remains in this suit.

The issues were tried to the court April 7, 1981 through April 15, 1981. Briefs have been filed.

The basic issue to be decided is the patentability of the Cordis device. It is the position of CPI that the invention claimed by the Terry Patent was previously made by others and that any difference between it and the prior art was obvious to those having ordinary skill in the art. Because of our disposition of this issue, there is no need to reach the infringement issue.

We deal here with a small electronic battery powered device which is implanted under the skin near and connected to the heart. Its operation is directed by pulse signals from without the body by a second device called a "programmer" through which pulse rate and other changes in an implanted pacemaker may be effected.

The claims of the patent in suit are capsulized in the abstract on the face sheet of the January 22, 1973 amended application.

> In the implantable cardiac pacer disclosed herein, various operating parameters are determined or controlled by the information held in a digital storage register such as a binary counter. The information so held may be varied by means of pulse signals transmitted through the body of a

patient within whom the pacer is implanted. Rate-sensing and count threshold control circuits are provided to prevent unintended changes in operating parameters.

A summary and description of the invention is followed by the listing of nine detailed claims.[1] A more simplified statement of the inventions claimed by Terry is that it is an implantable device with a counter which can be changed a step at a time by magnetic impulses from outside the body to adjust the operation of the implanted device, and also containing a "safety" counter to prevent unwanted changes taking place from spurious signals.

A patent is presumed to be valid, and the burden of proving invalidity rests on the person asserting it. 35 U.S.C. § 282. CPI has carried this heavy burden, *see E.I. DuPont de Nemours v. Berkley & Co. Inc.,* 620 F.2d 1247 (8th Cir. 1980), and we are convinced that the invention claimed by the Terry Patent is invalid under 35 U.S.C. §§ 102(g) and 103.

*The Terry Patent*

As originally filed on May 10, 1971, the application for the Terry Patent contained seventeen claims reflecting an implantable cardiac pacer which included a counter for counting externally applied pulses, and means for controlling the operating parameters of the pacer in response to the count held in the counter. The application named Cordis employees Reese S. Terry, Jr. and Gomer L. Davies as co-inventors of the patented subject matter.

The genesis of the claims contained in the original application was a memorandum authored by Gomer Davies on September 21, 1969 and sent to other Cordis personnel.

---

1. Claim 1, representative of the claims following it, provides:

    An implantable cardiac pacer comprising: means for detecting pulse signals having predetermined characteristics, which pulse signals can be applied externally of a patient within whom said pacer is adapted to be implanted; a first counter interconnected with said detecting means for selectively counting detected pulse signals; a second counter, controlled by said first counter and also responsive to said pulse

    signal detecting means for counting detected pulse signals occurring after the count held by said first counter reaches a preselected threshold value; a cardiac stimulation pulse generator having at least one changeable output parameter; and decoding means interconnected with said second counter for controlling said output parameter in predetermined correspondence with the value of the count held by said second counter.

The memorandum begins, "For various reasons (meeting competition, providing a more useful device for the patient, etc.) it is desirable to provide an implantable pacer system (of the standby type) in which the rate can be altered under external control." Plaintiff's Exhibit 49 at 701. In discussing approaches to a method for effecting pacer adjustments, Davies alluded to the basic programming technique ultimately claimed in the Terry patent application and incorporated in the Omnicor pacer marketed by Cordis: "One system . . . comprises a reed switch in the pacer that is repetitively actuated by an external magnet to step an internal circuit electrically through a series of states." Plaintiff's Exhibit 49 at 703.

This basic programming technique is described in the Lopin Patent 3,631,860, issued on an application filed October 27, 1969. That patent describes a programmable pacer that can be externally adjusted through the operation of a monostable magnetic reed switch as the pulsing element for changing the state of a counter comprised of electronic circuits which control the rate of the pacer.

Cordis cited the Lopin Patent to the Patent Office and obtained more narrow claims. The Terry patent application was amended by cancelling nine of the seventeen claims. Cordis stated in its amended application that the remaining claims defined an invention over Lopin. The remaining claims were directed to a protection circuit in the pacer designed to prevent alteration of the set operating parameters of the pacer by spurious magnetic signals.

*Timing of the Terry Invention*

Cordis argues that the date of conception for the invention claimed in the Terry Patent is September 20, 1969, the date of the Davies memorandum and that the Lopin Patent is thus unavailable as a prior art reference. We disagree.

The Davies memorandum did not describe or discuss means for preventing inadvertent programming of interference. It merely acknowledges "the rather sticky problem of external excitation of such circuits." Plaintiff's Exhibit 49 at 704. It goes on to state,

"Pulsed RF signals come naturally to mind, but the circuitry that could receive such signals could also respond to high-level interference." *Id.*

Cordis concedes that the claimed invention as a whole was not conceived until July 1, 1970, the date of a drawing by Reese Terry of the device which included the safety counter. The July 1, 1970 drawing was made in response to a request by Cordis President Dr. Murphy to develop an externally programmable pacer. Within several weeks of that request, Reese Terry made the July 1, 1970 drawing relating to external non-invasive programming.

The concept of using an address code to prevent an accidental reed switch closure from affecting the program circuit was originated by Terry. This code was designed to prevent reprogramming unless a grouping of eight magnetic pulses were received by the pacer. The concept of the address code is claimed in the Terry Patent.

We hold that the earliest date of conception of invention claimed in the Terry Patent is July 1, 1970. It was not until that date that the entire conception was complete:

The conception of an invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is, therefore, the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law.

*Rex Chainbelt Inc. v. Borg-Warner Corporation*, 477 F.2d 481, 491 (7th Cir. 1973) *quoting, Mergenthaler v. Scudder*, D.C.Cir., 11 App.D.C. 264 (1897). Davies' mere identification of the problem presented by outside interference with programming of the pacer, particularly in light of the fact that the prevention of accidental reprogramming constitutes an essential part of the

invention, is fatal to Cordis' position that the Davies memorandum is the conception of the claimed invention described in the Terry Patent. *See id.* at 491–92. Accordingly, the Lopin Patent is available as a prior art reference.

*Validity of the Terry Patent*

CPI presented extensive expert testimony concerning the scope and content of the prior art, the level of ordinary skill in the art as of July 1, 1970, and the differences between the prior art and the Terry Patent claims. CPI's expert, Leroy Prohovsky, is an electrical engineer with extensive experience in microelectronics and circuit design techniques. We find that Prohovsky, by virtue of his skill, training, and experience was well qualified to testify on this subject. Cordis declined to call an expert witness to rebut Prohovsky's testimony (Trial Transcript, 711–12). In so doing, we reject Cordis' contention that the scope of the prior art be limited to biomedical implantable stimulators. The scope of the pertinent art in this instance includes the field of electrical engineering in general, and more specifically, the use of both digital and analog circuitry. This finding is consistent with the principle that the concept of the scope of the art must be afforded a wide latitude. *See, e.g., Cathodic Protection Service v. American Smelting and Refining Company,* 594 F.2d 499 (5th Cir.1979), *see also, Skee-Trainer Inc. v. Garelick Mfg. Co.,* 361 F.2d 895 (8th Cir.1966).

*Lenzkes Patent*

Prior to July 1, 1970, the Huntington Institute of Applied Medical Research ("HIAMR") of Pasadena, California, and General Dynamics Corporation of Pomona California collaborated in the development of an implantable, digital, programmable biostimulator later called the "Telestimulator." HIAMR was founded by Drs. Robert Pudenz and C. Hunter Sheldon for the purpose of engaging in neurological research. HIAMR pioneered the implantation of electronic devices for nerve stimulation in the treatment of neurological disorders.

The inventor of the Telestimulator, H.H. Lenzkes of General Dynamics Corporation, prepared a report dated February 4, 1970, entitled "A Preliminary Concept for a Versatile Implantable Bi-Directional Nerve Stimulator." At that point, the Telestimulator had been "breadboarded", and the feasibility of the system confirmed. On May 13, 1970 Lenzkes reported in writing that the Telestimulator had been constructed by personnel of General Dynamics. That report contained a detailed description of the design organization of the Telestimulator. With the exception of some differences not relevant here, the report of May 13, 1970 parallels the description of the Telestimulator found in the United States Patent No. 3,727,616, issued to Lenzkes. This report also indicated that the device had been breadboarded using COS/MOS devices manufactured by RCA Company. According to Lenzkes' testimony, the breadboarded design functioned satisfactorily. In a Progress Report dated June 23, 1970, Lenzkes indicated that the device had been built in the laboratory and proof of the concept had been verified.

In October 1970 the first prototype of the Telestimulator was delivered to HIAMR. HIAMR personnel implanted it in a cat for testing purposes on or about November 23, 1970.

The Lenzkes Patent was filed subsequent to the Terry application. The evidence shows, however, that the Telestimulator was fully built and successfully tested prior to July 1, 1970. We find that these facts establish that the Telestimulator was actually reduced to practice prior to July 1, 1970, thus entitling it to priority under 35 U.S.C. § 102(g).

While the Telestimulator was being developed HIAMR and General Dynamics disclosed details of the project to outside persons. On August 6, 1970, personnel from Medtronic, Inc. visited General Dynamics and discussed the Telestimulator with Dr. Pudenz and General Dynamics personnel.

At the Neurological Society Conference held March 5, 1971 in San Antonio, Texas, Dr. Pudenz and E.L. Watkins delivered a detailed presentation regarding the Telesti-

mulator. This conference was attended by Dr. Tarjan, a Cordis Vice President, who later informed Reese Terry, Gomer Davies, Cordis President Dr. Murphy about the Telestimulator work.

In September 1971 Dr. Murphy visited HIAMR and observed an experiment utilizing a cat to demonstrate nerve stimulation. He was also furnished with a detailed technical report entitled "Continued Development of the Sheldon/Pudenz Biostimulator," which explained the operation óf the telestimulator.

Based on the foregoing facts, we hold that the Telestimulator work later described in the Lenzkes Patent was not "abandoned, suppressed or concealed" within the meaning of 35 U.S.C. § 102(g).

Plaintiff's expert Mr. Prohovsky testified at length in presenting a comparison of the Telestimulator work and claims set forth in the Terry Patent. The Telestimulator system described in the Lenzkes Patent, and in particular Figure 6 of that patent, incorporated an implantable stimulator including circuits 48 and 130 for receiving pulses of radio frequency (RF) energy transmitted through the skin from an external transmitter. The Lenzkes design utilizes a 21 bit shift register (132) which corresponds to the Terry counter 31.

Data is entered into the shift register-type counter 132 which ultimately functions as a memory for storing the received pulses. The Lenzkes design further includes a stimulation decoder 136 which comprises a second counter having three separate states. Decoder 136 corresponds to the Terry Counter 43. Controlling the entry of data into the first counter 132 and the second counter 136 is a Mode Logic Circuit 134. When power to the transmitter is turned on, a memory preset signal is applied to the first counter 132 to set all of its stages to a zero state. As the external transmitter feeds RF impulses into the receiver circuits 48 and 130, the Mode Logic Circuit 134 initially causes the pulses to be fed into the 21-bit shift register 132. The leading bit in the string of serial data entering the 21-bit counter following "power-

up" is forced to be a binary "1" signal and this signal is called the "data completion pulse." Following the application of 21 clock signals which are counted by the counter (shift register) 132, the "data completion pulse" exits from the shift register 132 and is applied to the Mode Logic Circuit 134. This causes the Mode Logic Circuit to block further data entries into the counter 132 and the subsequently received pulses are instead routed to the 3-state counter 136. The contents of the counter 136, in turn, determine the pulse width and the polarity of the stimulating pulse to be applied to the electrodes 52 and 54.

Prohovsky provided the court with comprehensive and credible testimony comparing the Terry claims with the Lenzkes design. His testimony fully supports the claim comparison chart, plaintiff's exhibit 60, which compels the conclusion that the Telestimulator fully anticipated claims 2, 7 and 8 of the Terry Patent under 35 U.S.C. § 102(g).

Prohovsky also explained the differences between the Terry claims and the Telestimulator. These differences include the use of a RF transmission signal to convey pulse information from the external transmitter in the Telestimulator, as opposed to the use of magnetic field to activate a magnetic reed switch in the Terry Patent. There is no switch debounce circuit in the Telestimulator because, with the use of the RF transmission system, it does not include any switch that requires "debouncing." The debounce circuit would have been necessary in the Telestimulator only if it had employed a magnetic reed switch. Another difference cited is that Counter 31 of the Terry Patent is reset when the reed switch is not receiving pulses at a sufficiently high rate. Shift register 132 is reset upon the application of power to the Telestimulator. Prohovsky credibly and fully identified all differences between the Telestimulator and the Terry Patent in compiling the claim comparison chart. His testimony in this regard is relevant to the consideration of the issue of obviousness under 35 U.S.C. § 103. That matter will be considered more fully below.

*The Wingrove Work*

Robert Wingrove, an employee of Medtronic, Inc. from 1958 through 1972, testified regarding his development of a digital, programmable implantable cardiac pacer during 1970. This pacer included a protection circuit for preventing accidental reprogramming of the pacer by spurious noises in the external environment.

Wingrove began development of the pacer in 1970, working with new integrated circuit devices called complementary metal oxide semi-conductor ("CMOS") circuits. These circuits were well suited to use in implantable pacers because of their switching characteristics and low power consumption.

Wingrove testified that the device he developed, as reflected in certain documents dated March 2, 1970 and March 13, 1970 was actually built and sent to a Dr. Chardack for implementation in a dog.

The first prototype of the Wingrove pacer is dated March 25, 1970. This device was actually built and tested. Another prototype was built and tested on or about May 27, 1970.

Wingrove, like others, recognized the need for a safety circuit to prevent accidental reprogramming of the pacer. To this end he developed a technique that utilized an ID pulse of a certain width which had to be presented to the implanted unit in order to open a gate to allow reprogramming.

A patent application for the Wingrove device was filed on July 26, 1971. Patent 3,833,005 was issued and is substantially identical to the "Third Prototype" drawings of May 27, 1970.

In the Wingrove design, the external transmitter sends a predetermined number of RF pulses to the implanted unit. Wingrove chose the parameters of the time frame within which the pulses had to be received with the aim of preventing noise frequencies encountered in nature from meeting the conditions. Thus the RF pulses had to persist for longer than 11 milliseconds, but not more than 14 milliseconds. The lower time threshold is established in resistor 22 and capacitor 26 in decoder 20 as found in Figure 1 of the Wingrove patent. The higher time threshold is determined by resistor 31 and capacitor 27. If the proper RF pulses are received, NOR gate 29 is activated, allowing counter 40 to be reset. Counter 40 which corresponds to the Terry counter 43 determines the rate at which stimulating pulses will be emitted implantable pulse generator 100.

While decoder 20, which functions as the safety circuit, is not a counter, it operates in much the same manner. In order for the RF pulses to persist for the required length of time, it is necessary that the implanted unit receive a predetermined number of RF pulses. The use of RF pulses of a predetermined width in order to enable counter 40 to be reset is substantially equivalent to the use of digital counter 31 in the Terry Patent. The differences between these are such that they would be obvious to one with ordinary skill in the art.

Mr. Prohovsky compared the Terry claims with the prior Wingrove work. He testified that Wingrove anticipates all nine claims of the Terry patent. We conclude that the Wingrove work does in fact anticipate the claims in the Terry Patent.

*Obviousness*

Even had the Terry Patent claims not been anticipated within the meaning of 35 U.S.C. § 102(g), we find that the differences between the prior art and the subject matter of the Terry Patent as a whole would have been clearly obvious to one with ordinary skill in the art of electrical engineering.

In reaching this conclusion, we have considered the scope and content of the prior art, including the Lozin Patent, the Telestimulator, the prior Wingrove work, and the Chardack, Bowers and Keller Patents. Prior reductions to practice under 35 U.S.C. § 102(g) are properly considered in making a determination of obviousness under 35 U.S.C. § 103. *Sutter Products Co. v. Pettibone Mulliken Corp.,* 428 F.2d 639 (7th Cir. 1970).

**570**

The Lopin Patent, the Telestimulator, and the Wingrove work are discussed above.

United States Patent No. 3,198,195, issued to Chardack, was filed on October 18, 1962. It claims an invasive needlelike device for changing the operating parameters of a pacer after implantation.

United States Patent No. 3,311,111, issued to Bowers, filed on August 11, 1964, and assigned to General Electric, discloses a controllable electric body tissue stimulator incorporating bistable switches, such as magnetic reed switches that may be actuated by an auxilliary magnetic field applied externally to the body. The reed switches are used to externally adjust the operation of the device.

The Keller Patent discloses a digitally timed pacer using a clock source and a frequency dividing chain to achieve timing.

The need for a safety circuit when using externally programmable implantable devices is elementary. The work of Lenzkes and Wingrove demonstrate the obviousness of the solution to the problem of inadvertent reprogramming. The differences in the prior art between the designs and means of preventing such inadvertent reprogramming are insubstantial. Because of the clear obviousness to the person of ordinary skill of the differences between the subject matter claimed by the Terry Patent and the prior art, we need not consider secondary factors such as long felt need, commercial success, and the like. *See Cathodic Protection Service v. American Smelting & Refining Company,* 594 F.2d at 513; *Centsable Products, Inc. v. Lemelson,* 591 F.2d 400, 403–04 (7th Cir.1979).

Based on all of the above findings with reference to the Lopin Patent, the Telestimulator, the Wingrove work, and the Chardack, Bowers, and Keller Patents, we conclude that the differences between the Terry Patent and the prior art would have been obvious to one with ordinary skill in the art.

Accordingly, we declare that Terry Patent 3,805,769 is invalid, and that said patent is not infringed by plaintiff because of the making, selling, or using of any apparatus made, sold or used by plaintiff. Plaintiff's claim for attorneys fees and costs is DENIED.

Let judgment be entered accordingly.